**In re MCA, INC. Shareholders Litigation.**

**Civ. A. No. 11740.**

Court of Chancery of Delaware, New Castle County.

Submitted: Jan. 30, 1991.
Decided: April 22, 1991.

Joseph A. Rosenthal, Morris, Rosenthal, Monhait & Gross, Wilmington, Liaison Counsel (Steven G. Schulman, Milberg Weiss Bershad Specthrie & Lerach, Mark C. Gardy, Abbey & Ellis, New York City, Stanley Wolfe, Berger & Montague, P.C., Philadelphia, Pa., of counsel), for plaintiff.

Martin P. Tully, and A. Gilchrist Sparks, III, Morris, Nichols, Arsht & Tunnell, Wilmington, (Theodore N. Mirvis, and Paul K. Rowe, Wachtell, Lipton, Rosen & Katz, New York City, of counsel) for MCA, Inc. and Individual defendants.

R. Franklin Balotti, Richards, Layton & Finger, Wilmington, (Barry R. Ostrager, Dennis G. Jacobs, Mary K. Vyskocil, Simpson Thacher & Bartlett, New York City, of counsel), for Matsushita Elec. Indus. Co., Ltd.

Craig B. Smith, Lassen, Smith, Katzenstein & Furlow, Wilmington, for objectors.

HARTNETT, Vice Chancellor.

The Court must consider whether to approve the proposed settlement of this purported class action pursuant to Chancery Rule 23(e). Plaintiffs ("Settling Plaintiffs") in this action join the defendants in urging the approval of the settlement. The Objectors, who are not parties in this action but are the plaintiffs in a pending action in Federal Court in California, object to that part of the settlement which would bar their federal claims and request the opportunity to opt-out of the Class or to have the federal claims excluded from the settlement.

After reviewing the settlement, the Court finds that the State claims being compromised have little or no merit and

therefore no value. The value of the settlement to the Class is also minimal. The claims asserted in the Federal Court, however, have at least arguable merit and therefore have significant value. This Court, on balance, finds, in its business judgment, that it would be unfair to bar the federal claims and therefore the settlement cannot be approved in its present form.

## I. PROCEDURAL BACKGROUND

This action was commenced in this Court as a purported class action on behalf of the stockholders of MCA, Inc., a Delaware corporation ("MCA"), on September 26, 1990— one day after the public announcement that Matsushita Electric Industrial Co. Ltd. ("Matsushita") and MCA were negotiating a possible acquisition of MCA by Matsushita. The complaint named MCA and its directors as defendants. Although no agreement between MCA and Matsushita existed at that time, breaches of fiduciary duties were claimed on the grounds that there was a failure by the directors of MCA to implement a market check procedure to ensure maximum shareholder value.

On November 26, 1990, MCA and Matsushita announced that they had entered into a Merger Agreement. Pursuant to the Merger Agreement, a wholly-owned subsidiary of Matsushita would make a cash tender offer for all MCA outstanding shares for $66 per share, conditioned upon the tender of at least 50% of the outstanding shares and the spinoff of a MCA wholly-owned subsidiary, known as Pinelands. The spinoff asset was a corporation that owned a television station that Matsushita was prohibited by federal law from acquiring. According to the Merger Agreement, 100% of Pinelands' stock was to be distributed to the MCA shareholders *pro rata* in the form of a stock dividend prior to the completion of the tender offer.

On December 3, 1990, an action was filed in the United States District Court for the Central District of California as *Epstein v. MCA, Inc., et al.*, No. CV–90–6451–R, ("the *Epstein* action"). It was alleged in that suit that Matsushita's tender offer involved a special deal for Lew R. Wasserman, MCA's chairman and chief executive officer. The Wasserman Agreement, apparently entered into contemporaneously with the MCA Merger Agreement, provided that immediately following completion of the tender offer, Mr. Wasserman would surrender his MCA stock in exchange for shares of preferred stock of the Matsushita subsidiary. The complaint further alleged that the Wasserman Agreement was in violation of Section 14(d)(7) of the Federal Securities Exchange Act of 1934 ("Federal Securities Act") (15 U.S.C. § 78n(d)(7)) and SEC Rules 14d–10 and 10b–13. The *Epstein* action named Matsushita as a defendant claiming alleged securities laws violations and also named MCA and Mr. Wasserman as defendants because they allegedly aided and abetted Matsushita.

On December 14, 1990, plaintiffs in this Delaware action filed an Amended Complaint and at their request a preliminary injunction hearing was scheduled for December 18, 1990. The Amended Complaint added an allegation of a failure to disclose a substantial conflict of interest involving defendants Wasserman, MCA management and its directors, based on a claim that Mr. Wasserman received preferential treatment. Matsushita was also named as a defendant in this Delaware action for the first time because it allegedly aided and abetted MCA in a breach of fiduciary duty by entering into a special deal with Wasserman. The Amended Complaint, however, did not challenge the Wasserman Agreement on the grounds that it constituted a breach of the Federal Securities Act as had been asserted in the federal court in California.

On December 18th, the parties in this Delaware action filed a Stipulation and Agreement of Compromise and Settlement (the "Settlement Agreement"). The settlement provided for a dismissal of the Delaware action with prejudice and for the release of all the claims of any member of the Class arising out of the transaction, including claims asserted in the federal *Epstein* action. On that same day, this Court

provisionally certified the Class pursuant to Chancery Rule 23(b)(2), and set a hearing on the proposed settlement for January 30, 1991.

The Matsushita tender offer was successfully completed about December 29, 1990 after the stock of the Pinelands subsidiary had been distributed to the MCA shareholders. About January 4, 1991, MCA merged into and with a Matsushita subsidiary.

On January 23, 1991, David Minton and Andrew Minton (the "Objectors") filed their objection to the proposed settlement insofar as it purports to bar the claims they have individually asserted in the federal suit in California.

## II. LAW OF SETTLEMENTS

The law of Delaware strongly favors voluntary settlement of contested issues. *Nottingham Partners v. Dana,* Del.Supr., 564 A.2d 1089, 1102 (1989); *Polk v. Good,* Del.Supr., 507 A.2d 531, 535 (1986); *Rome v. Archer,* Del.Supr., 197 A.2d 49 (1964).

■ In the settlement of a class action, the Court's role is to protect the Class members by balancing the fairness and reasonableness of the proposed settlement, with the policy favoring settlements. *Nottingham* at 1102; *Barkan v. Amstead Indus., Inc.,* Del.Supr., 567 A.2d 1279, 1283 (1989). The Court, in reviewing a settlement, should not decide the merits of the issues, but must consider the nature of the claims, the defenses asserted, and the factual and legal circumstances, and then apply its own business judgment to decide if the settlement is intrinsically fair. *Id.; Polk,* 507 A.2d at 536; *Nottingham,* 564 A.2d at 1102.

■ In determining if a proposed settlement should be approved, this Court must review various factors including the strengths and weaknesses of the asserted claims, the value of the benefit conferred on the Class by the settlement, and the risks, expenses, and delays of litigation. *Neponsit Investment Co. v. Abramson,* Del.Supr., 405 A.2d 97 (1979). The Court must especially balance the value of all the claims being compromised against the value of the benefit to be conferred on the Class by the settlement. *Sullivan v. Hammer,* Del. Ch., C.A. No. 10,823–NC, Hartnett, V.C. (Aug. 14, 1990), slip op. at p. 14, 1990 WL 114223 *app. pending* (upholding a settlement because there was adequate benefit to the class.)

## III. EFFECT OF THE RELEASE

It is not disputed that this Court may enter a judgment in connection with the settlement of a class action that results in the release of both state law claims and exclusively federal claims if the claims arise from the same factual predicate, even if the state court could not dismiss or adjudicate the federal claims. *TBK Partners, Ltd. v. Western Union Corp.,* 675 F.2d 456, 460 (2nd Cir.1982); *In re Mobile Communications Corporation of America, Inc., Consolidated Litigation,* Del. Ch., C.A. No. 10,627–NC *et seq.,* 1991 WL 1392 Allen, C. (Jan. 7, 1991) (approving a settlement of both state and federal claims as fair.) As a practical matter, a so-called "global settlement" is often necessary if any settlement at all will occur. *See, Raskin v. Birmingham Steel Corp.,* Del. Ch., C.A. No. 11,365–NC, Allen, C. (Dec. 4, 1990), slip op. at 13, 1990 WL 193326 (holding that the settlement was not fair.)

■ When a state court settlement of a class action releases all claims which arise out of the challenged transaction and is determined to be fair and to have met all due process requirements, the class members are bound by the release or the doctrine of issue preclusion. Class members cannot subsequently relitigate the claims barred by the settlement in a federal court. *Nottingham Partners v. Trans–Lux Corp.,* 925 F.2d 29 (1st Cir.1991); *Abramson v. Pennwood Investment Corp.,* 392 F.2d 759, 762 (2nd Cir.1968). A federal court is, however, free to review and determine the effect and scope of the release on the federal claims. *Nottingham Partners, supra; see also, In re Mobile, supra; Abramson, supra.*

Therefore, if this Court provides for the release of all the claims arising out of the challenged transaction, the claims which the Objectors have asserted in the federal suit will likely be forever barred.

## IV. CLASS CERTIFICATION

On December 18, 1990 the Class was provisionally certified by this Court pursuant to Chancery Rule 23(b)(2), to consist of all owners of MCA common stock on September 25, 1990. At the time of the filing of the suit and on the date the settlement agreement was entered into, the complaint sought injunctive and other equitable relief, as well as monetary damages, on behalf of the Class.

The Objectors assert, however, that the federal securities law claims predominate over the state law claims and that these claims are purely money damage claims. They, therefore, assert that the Class can only be certified pursuant to Chancery Rule 23(b)(3), which allows objecting Class members to be excluded or to opt-out of the settlement.

The Objectors point out that on January 30, 1991, the day that the Settlement Hearing was held, the tender offer had been completed, the merger consummated, and the spinoff dividend had been paid. They also correctly assert that the Settlement Agreement does not provide for any equitable relief. They, therefore, argue that no equitable remedy would have been appropriate at the time of the Settlement Hearing. Additionally, they point out that the entire Class does not have an action for damages because only those persons who owned MCA common stock on November 30, 1990—the day the Matsushita tender offer was commenced—have a claim pursuant to the Federal Securities Act. 15 U.S.C. § 78n(d)(7). Because damages, if any, will vary from shareholder to shareholder, the Objectors also suggest that the Class should be certified pursuant to Chancery Rule 23(b)(3) to allow those shareholders with monetary claims to opt-out of the settlement, if they desire.

The Settling Plaintiffs and defendants counter that both the Delaware action and the *Epstein* federal action sought equitable relief at the time the complaints were filed, at the time the Settlement Agreement was entered into, and up until the time the merger was consummated. They therefore assert that the Class should be certified under Chancery Rule 23(b)(1) or (b)(2) which do not allow for any opting-out.

In the context of a settlement of a class action, certification under Chancery Rule 23(b)(1) or (b)(2) is appropriate when the primary relief sought is equitable in nature. *Nottingham*, 564 A.2d at 1094–96; *In re Mobile*, slip op. at 34; *Steiner v. Sithe–Energies, L.P.*, Del. Ch., C.A. No. 9511–NC, 1988 WL 36133, Hartnett, V.C. (Apr. 4, 1988) (approving a settlement without an opportunity to opt out.)

When a Class is certified pursuant to Chancery Rule 23(b)(3), however, and the Class is seeking only money damages, constitutional due process requires that dissenting Class members be given the opportunity to opt-out of the Class. *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); *Schreiber v. Hadson Petroleum Corp.*, Del. Ch., C.A. No. 8513–NC, Hartnett, V.C. (Oct. 29, 1986), slip op. at 9–10, 1986 WL 12169 (approving a settlement without an opportunity to opt out;) *Raskin*, slip op. at 12–13; *In re Mobile*, slip op. at 33–36.

An action, however, which consists primarily of equitable claims with an ancillary request for monetary damages, will not require a provision for opting-out. *Joseph v. Shell Oil Co.*, Del. Ch., C.A. No. 7450–NC, Hartnett, V.C. (Feb. 8, 1985), slip op. at 10, 1985 WL 21125 (holding certification under Chancery Rule 23(b)(1)(A) and 23(b)(2) proper.)

In the present case, the claims were clearly primarily equitable when initially filed. The Delaware complaint sought a preliminary injunction and declaratory judgment. The federal *Epstein* action sought the opportunity for the shareholders to make an election between the types of consideration being offered, based on an assumption that two types of consideration were being offered in the tender offer. At

the time the Settlement Agreement was entered into and the Class provisionally certified, the tender offer was still pending and the merger had not been completed. The actions therefore still asserted primarily equitable claims. Like any agreement, a settlement should be reviewed from the perspective of the time at which it was entered into. *See Tull v. Turek,* Del.Supr., 147 A.2d 658, 661–62 (1958); *R. Zoppo Co., Inc. v. City of Dover,* 124 N.H. 666, 475 A.2d 12, 15 (1984). Subsequent events cannot change the character of what was settled on December 18, 1990.

I find, therefore, that certification of the Class pursuant to Chancery Rule 23(b)(2) is appropriate and no opportunity to opt out need be provided.

## V. THE VALUE OF THE CLAIMS TO BE SETTLED

■ The next step in determining whether the proposed settlement should be approved is to weigh the value of the claims being settled and released by the settlement, against the value of the settlement to the class members, and then to apply the Court's business judgment to determine if the settlement is intrinsically fair. First to be considered is the value of the claims being released.

### A. *The Delaware Action*

■ The plaintiffs in the Delaware action allege that the Board of Directors of MCA breached a fiduciary duty of care imposed upon them by *Revlon* and its progeny. The Amended Complaint added Matsushita as a defendant for allegedly aiding and abetting the claimed breaches. These claims are based on the duties imposed on directors to ensure that shareholders receive maximum value when a change of corporate control is inevitable. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.,* Del.Supr., 506 A.2d 173, 182 (1986). The Supreme Court of Delaware held in *Revlon* that when it is inevitable that a corporation is for sale, the directors' duty changes from an attempt to preserve the corporate entity, to that of an auctioneer to ensure the maximum value for the benefit of the shareholders. *Id.* at 182. Directors are not, however, required to follow a set course of action in the face of a change in corporate control. *Barkan,* 567 A.2d at 1286–87. Rather, they may choose various courses of action, but they must be guided by due diligence and good faith. *Id.*

There is nothing in the record to suggest that the directors of MCA did not act diligently or acted in bad faith. It is clear that the Matsushita/MCA Merger Agreement was a highly negotiated, arm's-length transaction. The price paid for MCA shares represented a 100% premium over the market price prior to public announcement of Matsushita/MCA discussions. Matsushita made a "last and final offer" of $64 per share which MCA's Board rejected and negotiated further to increase the offer to $66 per share. During two months of publicly reported negotiations, no other bidder emerged. The Merger Agreement provided for a "fiduciary out" which allowed MCA's Board to conduct a post-agreement market check and accept a higher offer. Again, no competing offer was made. MCA's Board successfully negotiated for the spinoff of 100% of Pinelands to MCA shareholders, thereby increasing stockholder value, over Matsushita's intent to retain an interest in that asset. Additionally, MCA's financial advisor expressed the opinion that the tender offer was fair and highly recommended the transaction.

It is clear, therefore, that the allegations of a breach of fiduciary duty by the directors of MCA in recommending the acceptance of the tender offer in the Delaware suit are without substantial merit.

■ Plaintiffs in the Delaware Complaint also challenged the Wasserman Agreement as a breach of fiduciary duty by Wasserman. Under that agreement, Wasserman, *inter alia,* would receive preferred shares of a Matsushita subsidiary in exchange for his MCA common stock. The preferred stock was redeemable at either party's option after five years. The redemption price is an amount equal to the liquidation preference ($5,000 per share) plus all unpaid dividends. The stock con-

tains the right to an 8.75% annual cumulative dividend. This agreement was entered into on November 26, 1990, just before the tender offer was announced and it was to be consummated immediately following the close of the tender offer.

Defendants allege that the Wasserman Agreement did not violate any Delaware law and that it had a valid business purpose of ensuring continuity of management.

 This claim of plaintiffs is also weak. A shareholder is not prohibited, by his status as a director, from dealing in the shares of the corporation. It is when the director uses inside information for his own benefit that he has abused his office and thus breached his duty of loyalty. *Brophy v. Cities Service Co.*, Del. Ch., 70 A.2d 5, 7 (1949).

There is no evidence that Mr. Wasserman used inside information to achieve a personal benefit for himself. The deal was also fully disclosed in Matsushita's Offer to Purchase.

I therefore find that the asserted state law claims are, at best, extremely weak and, therefore, have little or no value.

### B. *Federal Securities Claims*

While the Objectors do not object to the settlement and bar of the state law claims as asserted in the suit filed in this Court, they do object to the barring of the federal security violation claims that they have asserted in the federal action in California and which were never asserted in this Delaware action. The Objectors, in their federal suit in California, claim that the Wasserman Agreement violates SEC Rule 10b–13 and Section 14(d)(7) of the Federal Securities Act—more specifically, SEC Rule 14d–10 promulgated thereunder.

### C. *SEC Rule 10b–13 Violations*

 SEC Rule 10b–13 provides in pertinent part:

No person who makes a cash tender offer ... for any equity security shall purchase ... any such security otherwise than pursuant to such tender offer.

17 C.F.R. § 240.10b–13 (1969). This prohibition attaches at the earliest of either the announcement of the offer or the commencement of the offer and ends at the time the tendered shares must be accepted or rejected by the offeror. *Id.* The purpose of this rule is to protect shareholders who have tendered into a tender offer by prohibiting the Offeror from making an offer outside the tender offer on different terms. The SEC perceives any "outside deal" whether for a higher or lower price, to be detrimental to the shareholders who tendered. SEC Release No. 8712 [1969–1970 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 77,745 (Oct. 8, 1969).

The Objectors first claim that the Wasserman Agreement violates SEC Rule 10b–13 because it was entered into earlier on the same day that the tender offer was announced and it provided for the purchase of MCA common stock otherwise than pursuant to the tender offer. They therefore claim, in effect, that the Wasserman Agreement was actually part of the tender offer.

The Settling Plaintiffs and the defendants respond that SEC Rule 10b–13 does not apply to the Wasserman transaction. According to them, because the Wasserman Agreement was entered into earlier on the same day as the public announcement of the tender offer, it was entered into before the prohibition of SEC Rule 10b–13 attached. The consummation of the deal was to take place immediately following the acceptance of the tendered shares. Therefore, they claim, the Wasserman transaction falls outside the scope of SEC Rule 10b–13.

Settling Plaintiffs and defendants also assert that SEC Rule 10b–13 does not apply to private purchases. *City Nat. Bank v. American Com. Financial Corp.*, 801 F.2d 714, 717 (4th Cir.1986). Although this is a correct assertion, the line between a private and public purchase has not yet been clearly drawn. *See, Heine v. The Signal Companies, Inc.*, [1976–1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,049, 1977 WL 930 (S.D.N.Y.1977). *Cf. Cattlemen's Investment Co. v. Fears*, 343

F.Supp. 1248 (W.D.Okla.1972) with *Nachman Corp. v. Halfred, Inc.*, [1973–1974 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,445, 1973 WL 457 (N.D.Ill.1973).

It is not disputed that Matsushita made public purchases of MCA stock through a tender offer. What is disputed is whether the Wasserman Agreement, because of its timing, can be considered to be a part of that tender offer for the purposes of SEC Rule 10b–13. This issue has not yet been definitively addressed by the courts and therefore this claim of Objectors clearly has arguable merit.

### D. *SEC Rule 14d–10 Violations*

█ The second federal securities violation asserted by the Objectors is based on SEC Rule 14d–10, promulgated under Section 14(d)(7) of the Federal Securities Act. This is the "all holders/best price" rule. Pursuant to Rule 14d–10 more than one type of consideration may be offered to shareholders only if "security holders are afforded equal right to elect among each of the types of consideration offered." 17 C.F.R. § 240.14d–10 (1986). According to the Objectors, Matsushita offered Wasserman a tax-free stock exchange, while those who tendered into the offer would receive fully taxable cash. The Objectors assert that the Wasserman Agreement therefore violates SEC Rule 14d–10 because those who tendered into the offer were not afforded the equal right to choose between the two types of consideration offered.

Settling Plaintiffs and defendants assert, however, that the plain language of SEC Rule 14d–10 bars the Objectors' claim. While they concede that SEC Rule 14d–10(c) requires that shareholders be given the opportunity to elect between different types of consideration being offered, they assert that subdivision (c) only applies if subdivision (a) is violated. SEC Rule 14d–10(a) applies when one offeree is receiving higher value than other offerees. Defendants argue that subdivision (a) was not violated because the value of Wasserman's preferred stock is substantially less than the cash consideration offered by Matsushita in the tender offer.

Objectors' claim of a violation of SEC Rule 14d–10 also seems to have at least arguable merit. There were two types of consideration offered in the tender offer: one was cash and the other was securities. Although it is claimed that the value of the consideration given to Wasserman had less value than the cash offered to the other stockholders, the true economic value of the Wasserman consideration is uncertain. Therefore, SEC Rule 14d–10(c) may have required that the shareholders should have been given the opportunity to have made an election as to which consideration to receive. This issue has also never been definitively addressed by the courts and this claim therefore also has at least arguable merit.

█ This Court must carefully scrutinize a settlement that has the effect of barring claims of at least arguable merit that were never asserted in Delaware but were asserted in a suit elsewhere, especially if the settlement has little or no value to the class. Cf. *Selfe v. Joseph*, Del.Supr., 501 A.2d 409 (1985).

## VI. THE VALUE OF THE PROPOSED SETTLEMENT

█ In consideration for the release of all claims, known or unknown, in both the Delaware action and the federal *Epstein* action, defendants offer to pay plaintiffs' attorneys fees in this Delaware action of up to $1 million. This generous payment, of course, confers no benefit on the members of the Class. The settlement also provides that the Pinelands subsidiary will adopt an altered Shareholders Rights Plan ("poison pill"). The altered poison pill will provide that it will be redeemed: if a fully financed cash tender offer is made for Pinelands; is held open for at least sixty days; and 66⅔% of the outstanding shares are tendered into the offer. The defendants argue that amending the existing poison pill will encourage a third party to make a bid for Pinelands, thus resulting in increased value for the MCA shareholders (the Class) who received the Pinelands stock dividend. Significantly, the altered

poison pill need be in effect for only one year.

Objectors correctly point out that because management owns 26% of Pinelands outstanding stock, in order for the pill to be redeemed against the wishes of management, 90% of Pinelands stock would have to be tendered into the offer (excluding management's shares).

The Objectors also provided the Court with a copy of the Certificate of Incorporation of Pinelands that contains numerous anti-takeover devices of such magnitude as to make the poison pill merely icing on the cake.

The value to the Class from the Pinelands revised poison pill is therefore illusionary and the revision apparently was proposed merely to justify a settlement which offers no real monetary benefit to the Class.

## VII. CONCLUSION

In summary, there is no real monetary benefit to the Class members from the settlement and the only claims which have any substantial merit are the claims asserted by the Objectors in the California federal suit that were not asserted in this Delaware action. It would, therefore, be unfair to compel the release of the federal claims by approving the settlement in its present form. The Court finds, therefore, in its business judgment, that the Settlement Agreement, as presently constituted, is not fair and must be rejected.

IT IS SO ORDERED.